**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNION PACIFIC RAILROAD COMPANY,** | **CASE NO. 8:11CV8** |
| **Plaintiff,** | |
| **vs.** | **MEMORANDUM** |
| | **AND ORDER** |
| **BEEMAC TRUCKING, LLC,  LANDSTAR RANGER, INC., and EDWARD SAMUEL EDLING,** | |
| **Defendants.** | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 149) filed by Plaintiff Union Pacific Railroad Company ("UP"), and the Motions for Summary Judgment filed by Defendant Beemac Trucking, LLC ("Beemac") (Filing No. 147), and Defendants Landstar Ranger, Inc. ("Landstar"), and Edward Samuel Edling ("Edling") (Filing No. 144).  For the reasons discussed below, all three motions will be granted in part and denied in part.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are those that are stated in the parties' briefs in support of and in opposition to the cross-motions for summary judgment and supported by pinpoint citations to admissible evidence in the record, that the parties have admitted, and that the parties have not properly resisted as required by NECivR 56.1 and Fed. R. Civ. P. 56.

UP is a Delaware corporation with its principal place of business in Omaha, Nebraska.  Beemac is a limited liability company with its principal place of business in Pennsylvania.  Landstar is a Florida corporation with its principal place of business in Florida.  Edling is an individual who, at all relevant times, was a resident of Salem, Ohio.

In June 2009, UP and Beemac entered into an agreement titled, "Motor Carrier Transportation Agreement" (the "MCTA") (Filing No. 152-15), under which Beemac agreed to provide "motor carrier transportation services" for UP.  Within the MCTA, Beemac represented that it was "a duly qualified and authorized contract carrier" that could "lawfully provide [UP] all of the transportation and related services set forth [in the MCTA] in accordance with the terms and conditions of th[e] [MCTA], in each case as a carrier of general commodities in interstate and foreign commerce."  (*Id.* at § 1.A.) Section 5 of the MCTA states:

> A.      Each Shipment shall be evidenced by a . . . bill of lading . . . or other form of document containing the applicable information as outlined in Exhibit B, which shall be signed by [Beemac] or [Beemac]'s agent or employee describing the kind and quantity of freight tendered as described in the shipping document . . . received by [Beemac] at origin. . . . In the event of any conflict between the terms and conditions of such documentation and the terms and conditions of this Agreement, the terms and conditions of this Agreement shall govern.
>
> B.      Upon the delivery of a Shipment, [Beemac] shall obtain a receipt in a form specified or approved by [UP] showing the kind and quantity of [UP]'s Defined Goods delivered to the consignee of the Shipment at the destination specified by [UP].  [Beemac] shall also show on the receipt the date of delivery of the Shipment and shall have each receipt signed by the applicable consignee or by consignee's employees or agents.

(*Id.* at § 5.)  Section 15 of the MCTA states:

> Neither party shall be allowed to assign or transfer its interest in this Agreement in whole or in part without the prior written consent of the other party[.] . . .
>
> This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Nebraska.  . . .
>
> No modification or amendment to this Agreement shall be of any force or effect unless made in writing, signed by [Beemac] and [UP] and specifying the nature and extent of such modification or amendment.

(*Id.* at § 15.B., C., G.)  Sections 10 and 11 of the MCTA provide that Beemac was required to procure insurance for UP and indemnify UP for certain harms.  (*See Id.* at §§ 10, 11.)

2

Beemac contends that despite the MCTA's delivery terms, UP had a common practice or procedure for deliveries of equipment, such as trucks, that applied when no one from UP was present to accept delivery, *i.e.*, leaving the keys to the equipment on the equipment's dipstick, and that the common practice or procedure applied to the shipment at issue in this case. (*See* Dep. of Eugene Tietz, Filing No. 150-1 at 30:13-19; Dep. of David Hanner, Filing No. 150-4 at 80:20-82:5, 99:17-100:17, 101:10-23.)

In 2010, UP needed one of its grapple trucks moved from Benedict, Kansas, to Riverton, Louisiana. On January 8, 2010, UP solicited bids from a number of carriers with whom it had previous agreements. UP's request for bids listed certain requirements and terms for the shipment, including some delivery terms. In a section titled "COMMENT/SPECIAL INSTRUCTION," the bid request stated "EMPLOYEES WILL LOAD AND UNLOAD BOTH LOCATIONS. GANG WILL ACTUALLY UNLOAD RIVERTON, LA ABOUT 5 MILES NORTH OF COLUMBIA, LA." (Filing No. 152-12 at 2.) The bid request also indicated that UP wanted the shipment delivered between 9:00 a.m. and 12:00 noon, Central Standard Time, on January 10, 2010. (*Id.* at 1.)

Beemac submitted the winning bid, but did not have a truck available to carry the shipment. Beemac posted the job on a "load board," and received a response from a Landstar agent, and arranged to have Landstar handle the shipment. UP contends that Beemac "subcontracted" the shipment to Landstar. Beemac asserts that it "forwarded" the shipment of the grapple truck to Landstar.

Landstar and Beemac agreed that Landstar would act as the carrier and transport the grapple truck from Kansas to Louisiana. Landstar and Beemac had entered into a "CARRIER/BROKER TRANSPORTATION AGREEMENT" (the "CBTA")

3

on or about June 19, 2008, for the purpose of having Landstar "satisfy some of [Beemac's] transportation needs[.]   (Filing No. 166-2.)   The CBTA controlled the relationship between Beemac and Landstar.  Section 9 of the CBTA states:

> [W]hile freight is under [Landstar's] care, custody, or control, [Landstar] shall assume common carrier (i.e. Carmack Amendment) liability for actual loss, damage or injury to Customers' freight[.] . . . The measure of the loss, damage, or injury shall be the lesser of the actual replacement cost or the cost of repair, . . . (2) for shipments of commodities in other than new condition, including but not limited to . . . used machinery or parts, not to exceed the lesser of $1.00 per pound of $50,000 per truckload shipment.   [Landstar] shall not be liable for indirect, special or consequential damages, or other special economic losses, regardless of its knowledge. . . . [Beemac] agrees to indemnify [Landstar] from any claim, loss, damage, cost, including reasonable attorney fees, or cause of action from [Beemac]'s Customers if [Beemac] enters into an agreement with its Customers specifying a liability standard other than that in this paragraph.

(*Id.* at CM/ECF p. 5 § 9.)  Landstar's agent gave Edling's telephone number to Beemac so Beemac could contact Edling, Landstar's driver, about the shipment.   An independent contractor operating agreement governed Edling and Landstar's relationship.

On January 9, 2010, Edling picked up the grapple truck in Kansas.  The truck was not in any type of container that would have prevented Edling from inspecting it, and it was driven up ramps onto Edling's trailer.  Edling filled out a bill of lading (Filing No. 152-17) that indicated the property was received in apparent good order.  No one from UP signed the bill of lading's "Shipper Certification" line.

Edling did not deliver the load on January 10, 2012, as requested in UP's bid request.  Instead, Edling arrived at the delivery site at 9:45 p.m., Central Standard Time, on January 12, 2010.  UP was aware the delivery would not be made as specified in the bid request, but contends it was not aware the delivery would occur after daylight hours on January 12, 2010.  (Dep. of David Hanner, Filing No. 150-4 at 46:1-49:17.)  UP

4

believed Edling was prohibited from traveling with the oversized load after daylight.  (*Id.* at 40:2-11, 49:11-20.)

When Edling arrived at the delivery site, the UP foreman for the site, David Hanner, was not present, and none of Hanner's employees requested overtime to work that evening.  While Edling was at the site, someone showed up and helped him unload the grapple truck.  This man did not provide Edling with any form of identification, and the man was not wearing a reflector vest or a hardhat, which UP employees are supposed to wear any time they work on or near a railroad track.  After the man helped Edling unload the grapple truck, Edling left the truck's keys on its dipstick.  Edling stated in his deposition that when he picked up the grapple truck in Kansas, a UP employee instructed him to follow this procedure.  (Dep. of Edward Edling, Filing No. 150-3, 83:13-19.)  The man who had helped Edling unload the truck was standing next to Edling at the time and could see where Edling placed the truck's keys.

The bill of lading, referenced above, contained a "receiver certification" signature line for the consignee to sign acknowledging receipt of the property described in the bill of lading in good condition, "except as noted."  Nobody from UP signed the "receiver certification" signature line.  Beemac contends UP does not always sign a bill of lading when equipment is delivered even if someone from UP is present at the time.  (*See* Dep. of David Hanner, Filing No. 150-4 at 122:13-123:8.)

The man who helped Edling unload the truck remained at the delivery site after Edling left.  Edling did not call anyone at UP after unloading the truck.  (Dep. of Ed Edling, Filing No. 150-3 at 185:18-186:1.)

5

At approximately 2:00 a.m. on January 13, 2010, a UP train collided with the grapple truck, which was parked on the railroad tracks, and the truck was destroyed. UP contends the value of the truck was $268,689.33, based on receipts indicating that UP purchased the truck for $94,190.00 and spent $147,499.33 for modifications. (*See* Filing No. 152-14.)[1]  The Defendants assert that the truck's value was $95,100.00[2] prior to the collision, and its salvage value was $15,212.00, making the actual loss $79,888.00.  They point to an expert report to support this assertion.  (*See* Filing Nos. 166-1 at CM/ECF p. 52, 170-1 at CM/ECF p. 15.)

Two UP employees, L.R. Reed and Roy Brown, were operating the train at the time it collided with the truck, and suffered injuries as a result.  Both employees made claims against UP under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*  UP settled the matter with Reed for $65,000.00, and the matter with Brown for $217,603.43.   On the date of the collision, UP's trains were also delayed "AS A RESULT OF AN INCIDENT," resulting in UP incurring $8,025.48 in expenses.  (Filing No. 152-10).

Although Beemac disputes the quality of the investigation UP made in its attempt to identify the man who helped Edling unload the grapple truck, it is uncontroverted that UP took steps to determine the identity of the man, but was unsuccessful.   On

---

[1] To the extent UP contends that the value of the grapple truck is equal to the amount it spent to purchase and modify it for improvements, the Court notes that the evidence to which UP has pointed seems to indicate that the grapple truck's value was $241,689.33, not $268,689.33.

[2] The Defendants contend that $95,100.00 was the "actual cash value" of the grapple truck immediately prior to the collision.  The Defendants suggest this value takes into account that the grapple truck depreciated in value after UP purchased it and spent money to improve it, whereas the value UP set forth only takes into account the truck's purchase price and the cost of improvements.  The value the Defendants set forth, which is only $910.00 more than the price at which UP purchased the truck, "is based on a [sic] internet search of truckpaper.com as well as a phone conversation with Rowdy Yeates with Yeates Equipment located in Byram, MS."  (Filing No. 166-1 at CM/ECF p. 52.)

6

September 24, 2010, UP sent a letter to Beemac.  (*See* Filing No. 152-11.)  The letter

stated, in part:

> This letter serves as notice of [UP]'s claim against Beemac for all losses, damages, and liabilities arising from the train-vehicle incident on January 13, 2010 in Riverton, Louisiana.  As you are aware, a [UP] train collided with a [UP] Grapple truck at approximately 2:00 a.m. on January 13, 2010 in the Riverton, Louisiana rail yard.  The Grapple truck was wrongfully parked on the track at the time of the collision.  The Grapple truck had been delivered to the Riverton rail yard just two hours earlier by Landstar driver Ed Edling.  Mr. Edling transported the . . . truck in his tractor trailer from Kansas to Riverton, Louisiana.

(*Id.* at 1.)  The letter also indicated what UP claimed to be the grapple truck's  purchase

price and salvage value; UP's potential FELA liability resulting from the incident; and the

cost of train delays resulting from the incident.  (*Id.* at 2-3.)

 UP filed its Complaint (Filing No. 1) on January 12, 2011, asserting five causes

of action: (1) negligence against all the Defendants; (2) contractual indemnity against

Beemac; (3) common law indemnity against all the Defendants; (4) breach of contract

against Beemac; and (5) a claim under the Carmack Amendment to the Interstate

Commerce Act, 49 U.S.C. § 14706 *et seq.*, against Beemac and Landstar.  With respect

to its negligence claim, UP alleges that the

Defendants breached their duty to [UP] as follows:

> a.    In failing to exercise reasonable care in attempting to deliver the Grapple Truck to [UP];
>
> b.    In failing to exercise reasonable care to properly store the Grapple Truck until it was physically delivered to [UP];
>
> c.    In failing to exercise reasonable care in handling the Grapple Truck until it was physically delivered to [UP]; and
>
> d.    In failing to exercise reasonable care in parking the Grapple Truck until it was physically delivered to [UP].

(*Id.* at ¶ 22.)  UP alleges that it sustained various losses proximately resulting from this

alleged negligence.  (*Id.* at ¶¶ 23-24.)  With respect to its contractual indemnity claim

7

and breach of contract claims, UP contends that the MCTA required Beemac to indemnify UP for the losses resulting from the performance of the MCTA and to obtain insurance coverage for those loses, but that Beemac failed to do so.  (*Id.* at ¶¶ 25-29, 35-38.)  With respect to its common law indemnity claim, UP contends it was obligated to pay Reed and Brown for the injuries they sustained in the train collision with the grapple truck, and, under the circumstances, justice requires that Defendants indemnify UP for that liability.  (*Id.* at ¶¶ 30-34.)  UP acknowledges that "[t]his case involves a claim brought under [the Carmack Amendment].  The state law claims arise from the same underlying transaction."  (Pl.'s Br., Filing No. 151 at CM/ECF p. 4 ¶ 5.)

The parties filed their cross motions for summary judgment on January 4, 2013. UP seeks to establish that it is entitled to judgment as a matter of law with respect to each of its claims.  In its Answer, Beemac alleged as an "affirmative defense" to UP's Carmack Amendment claim that UP failed to provide notice of that claim as required by statute.  (Filing No. 26 at ¶ 55.)  In its motion, UP also seeks to establish that it provided the required notice.  In their cross-motions, the Defendants seek to establish that UP failed to point to evidence sufficient to support its Carmack Amendment claim.  If the Court finds that UP has pointed to evidence sufficient to support that claim, the Defendants seek to establish that the damages UP may recover under the Carmack Amendment are limited to the actual damage caused to the grapple truck.  The Defendants also seek to establish that UP's state law claims are preempted by the Carmack Amendment and, therefore, must be dismissed.  If the Court finds they are not preempted, the Defendants seek to establish that UP failed to point to evidence

8

sufficient to support those claims.  Landstar and Edling also seek to establish that their liability under the Carmack Amendment is limited by the terms of the CBTA.

## STANDARD

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor."  *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).  However, "'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'"  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

"If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  .  "[W]here the *nonmoving* party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Id.* at 324 (emphasis added).

In response to the movant's showing, the nonmoving party's burden is to produce "evidentiary materials that demonstrate the existence of a 'genuine issue' for trial."  *Id.* at 331.  "[T]he absence of an adequate response by the nonmovant, even after the

9

moving party has carried its initial burden of production, will not automatically entitle the movant to entry of summary judgment." *Lawyer v. Hartford Life & Acc. Ins. Co.*, 100 F. Supp. 2d 1001, 1008 (W.D. Mo. 2000) (citing *Celotex*, 477 U.S. at 331). Instead, "the moving party must show that the evidence satisfies the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (citing *Celotex*, 477 U.S. at 331).

In other words, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

## DISCUSSION

### I. Carmack Amendment Claim

The Carmack Amendment "essentially provides that a carrier is liable for the actual loss or injury it causes to a shipper's property." *Cont'l Grain Co. v. Frank Seitzinger Storage, Inc.*, 837 F.2d 836, 839 (8th Cir. 1988).[3] "To make a prima facie

---

[3] *See* 49 U.S.C. § 14706(a)(1):

A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading and, except in the case of a freight forwarder, applies to property reconsigned or diverted under a tariff under section 13702. Failure to issue a receipt or bill of lading does not affect the liability of a carrier. A delivering carrier

case under the Carmack Amendment, a plaintiff must show 1) delivery to the carrier in good condition; 2) arrival in damaged condition; and 3) the amount of damages caused by the loss." *Camar Corp. v. Preston Trucking Co., Inc.*, 221 F.3d 271, 274 (1st Cir. 2000) (citing *Mo. Pac. R. Co. v. Elmore & Stahl,* 1964, 377 U.S. 134, 138 (1964)); *see also Cont'l Grain Co.*, 837 F.2d at 839. The Carmack Amendment does not require the plaintiff to prove negligence. *Just Take Action, Inc. v. GST (Americas) Inc.*, No. 04-3024 ADM/RLE, 2005 WL 1080597, at *4 (D. Minn. May 6, 2005).

If the shipper establishes its prima facie case, "to avoid liability the carrier must prove that it was not negligent and that the damage was caused by an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods." *Cont'l Grain Co.*, 837 F.2d at 839.

UP contends that it has presented evidence sufficient to establish all three elements of its Carmack Amendment claim. The Defendants do not dispute that they received the grapple truck from UP in good condition. They argue, however, that the

---

is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.

*See also* § 13501(1)(A) (stating that jurisdiction is proper under subchapter I of chapter 135 "to the extent that passengers, property, or both, are transported by motor carrier . . . between a place in . . . a State and a place in another State[.]"); § 13531(a)(1) (stating that jurisdiction is proper under subchapter III of chapter 135 "over service that a freight forwarder undertakes to provide, or is authorized or required under this part to provide, to the extent transportation is provided in the United States and is between . . . a place in a State and a place in another State[.]"). *See also* § 13102(3) ("The term 'carrier' means a motor carrier, a water carrier, and a freight forwarder."); § 13102(23):

The term "transportation" includes—

(A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

grapple truck was not damaged when it was "delivered."  If the Court finds that there is evidence indicating the truck was damaged before it was "delivered," the Defendants assert that there is a material issue of fact relating to the amount of damage caused to the truck.  They also argue that the train delay costs and FELA settlement amounts are not recoverable as special damages because they were not foreseeable at the time they agreed to transport the truck from Kansas to Louisiana.  In other words, at issue is whether UP has pointed to evidence sufficient to support the second element of its prima facie Carmack Amendment case and, if it has, the extent of the actual loss or damage caused to the grapple truck and whether UP may recover as special damages its train delay costs and the amount it paid to settle the FELA claims.

### A.  Arrival in Damaged Condition

"The liability of a carrier for damages to goods shipped through interstate commerce extinguishes upon delivery" of the goods to the proper party.  *Intech, Inc. v. Consol. Freightways, Inc.*, 836 F.2d 672, 674 (1st Cir. 1987) (citing *Republic Carloading & Distributing Co. v. Mo. Pac. R. Co.,* 302 F.2d 381, 386 (8th Cir.1962)); *see also Republic Carloading*, 302 F.2d at 386 (emphasis added) ("Common carrier liability ceases upon delivery of the shipment *to the consignee*."); *PolyGram Group Distribution, Inc. v. Transus, Inc.*, 990 F. Supp. 1454, 1458 (N.D. Ga. 1997) ("Liability under both [the Carmack Amendment and the Federal Bills of Lading Act, 49 U.S.C. § 80111(a),] ceases upon delivery of the goods to the proper person.").  "Generally, the spotting of a shipment at the consignee's place of business constitutes delivery regardless of whether the consignee has accepted or rejected the goods."  *Intech*, 836 F.2d at 674. The spotting of a shipment at the consignee's place of business, however, "is not [a]

12

*final* delivery if anything remains to be done by the carrier in order to effectuate a delivery." *Id.* (internal citations and quotation marks omitted). Ultimately, the contract between the parties, as interpreted according to the parties' intentions, controls the issue of when delivery occurs. *See Menlo Logistics, Inc. v. W. Express, Inc.*, 269 F. App'x 715, 718 (9th Cir. 2008)[4]; *Intech*, 836 F.2d at 674 (first alteration in original) (quoting *Ga., F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 195 (1916)) ("'[D]elivery' must mean delivery as required by the contract [of carriage],' (*i.e.*, the bill of lading and the tariffs)[.]").

UP contends that the grapple truck was not "delivered" before the train collided with it because the grapple truck was not delivered according to the terms of the MCTA and bid documents. Therefore, UP argues that the truck arrived in a damaged condition. UP also argues that even if the MCTA's delivery terms did not apply to the shipment, the record reflects that the circumstances present at the time Edling unloaded the grapple truck required him to do something more than place the keys on the truck's dipstick to effect a valid and final delivery. The Defendants assert that UP waived compliance with the delivery terms set forth in the MCTA and bid documents when its employees in Kansas represented to Edling that he could deliver the truck after hours by leaving the keys to the truck on the truck's dipstick, and they argue that Edling

---

[4]

It is the contract that controls when delivery occurs. In general, delivery occurs when one party surrenders-and the other party accepts-possession, custody, and control of the goods involved. But, [i]f the intent of the parties . . . requires more . . . then delivery is not complete by a mere surrender and acceptance.

*Id.*

13

effected a valid and final delivery prior to the train colliding with the grapple truck, by following those instructions.[5]

The record reflects, and the Defendants do not seem to dispute, that Edling did not comply with the delivery terms of the MCTA or bid documents.[6]  While the MCTA states that attempts to modify its terms would be effective only if in writing, "[a] party may waive a written contract in whole or in part, either directly or inferentially" through "express declarations manifesting the intent not to claim an advantage."   *D & S Realty, Inc. v. Markel Ins. Co.*, 789 N.W.2d 1, 17-18 (Neb. 2010).  Generally, "to establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his or her part."  *Id.*

Based on the evidence to which the Defendants have pointed in the record, a reasonable finder of fact could conclude that UP waived the need for compliance with the delivery terms of the MCTA and bid documents.  The Defendants have pointed to

---

[5] Landstar and Edling also argue that they were not bound by the terms of the MCTA.  As will be explained below, even if the MCTA's delivery provisions did not apply to the shipment of the grapple truck, a material issue of fact exists with respect to whether a valid, final delivery had been effected. Therefore, whether Landstar and Edling are bound by the MCTA does not affect the disposition of the present Motions.  Nevertheless, the Court notes that it appears Landstar and Edling are bound by the MCTA.  *See United States v. Miss. Val. Barge Line Co.*, 285 F.2d 381, 389 (8th Cir. 1960) ("The indisputable effect of the Carmack amendment is to hold the initial carrier . . . as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents[.]"); *Tempel Steel Corp. v. Landstar Inway, Inc.*, No. 98 C 6839, 1999 WL 519412, at *4 (N.D. Ill. July 9, 1999), *aff'd*, 211 F.3d 1029 (7th Cir. 2000) ("But under the Carmack Amendment, connecting carriers are deemed to be agents of the originating carrier.").  *Cf. Tex. & P. Ry. Co. v. Leatherwood*, 250 U.S. 478, 479 (1919) (finding subsequent carriers could use a "through bill of lading" that the original carrier provided to the shipper as a defense in a suit brought by the shipper against the subsequent carriers, reasoning that "[t]he bill of lading given by the initial carrier embodies the contract for transportation from point of origin to destination; and its terms in respect to conditions of liability are binding upon the shipper and upon all connecting carriers[.]").

[6] The MCTA indicates Edling was required to obtain a signed receipt from UP.  (Filing No. 152-15 at § 5.B.)  The bill of lading also seems to anticipate that someone from UP would sign it to certify that UP received the grapple truck "IN GOOD CONDITION EXCEPT AS NOTED."  (Filing No. 152-17.)  Neither of the Defendants have pointed to any evidence indicating Edling received a signed receipt from UP or had someone from UP sign the bill of lading when he unloaded the grapple truck at the delivery site.

14

evidence indicating that Edling received instructions from UP employees suggesting that Edling could effect a delivery of the truck by unloading it at the delivery site and leaving the keys to the truck on its dipstick, consistent with UP policy in place at the time. A reasonable finder of fact could conclude that, through those instructions, UP manifested an intent not to require compliance with the MCTA's and bid documents' delivery terms or that the instructions amounted to an estoppel on UP's part. As a result, Edling's failure to comply with the delivery terms of the MCTA and bid documents does not mean judgment should be entered in UP's favor as a matter of law.[7] However, the evidence to which the Defendants have pointed in support of waiver is not "so powerful that no reasonable jury would be free to disbelieve it." *See Lawyer*, 100 F. Supp. 2d at 1008 (citing *Celotex*, 477 U.S. at 331). Therefore, there is a material issue of fact with respect to whether UP waived the MCTA's delivery provisions for purposes of delivering the grapple truck.

Even if UP waived the need for compliance with the delivery terms of the MCTA and bid documents, a material issue of fact still exists with respect to whether Edling effected a final and valid delivery of the grapple truck. It is undisputed that the grapple truck had not sustained any damages at the time Edling unloaded it at the delivery site. Viewing the evidence in the light most favorable to the Defendants and making all reasonable inferences in their favor, the record reflects someone from UP may have been present at that time, helped unload the truck, and accepted the truck from Edling. Although no one from UP signed the "shipper certification" signature line, the Defendants have pointed to evidence indicating UP does not always sign bills of lading

---

[7] *See* 13 Williston on Contracts § 39:21 (4th ed.) (stating that "the existence of . . . facts [sufficient to constitute a waiver] in a given case is a question of fact to be decided by the fact finder.").

even when an employee or representative is there to accept delivery. Also, the fact that no one from UP requested overtime on January 12, 2010, does not necessarily mean that no one from UP was present to accept delivery from Edling that night. Consequently, a reasonable finder of fact could conclude that the grapple truck did not arrive at the delivery site in damaged condition, and UP's Motion will be denied to the extent UP seeks to establish the second element of its prima facie case.

On the other hand, UP has pointed to evidence in the record indicating that no one from UP was present at the delivery site at the time Edling arrived. Hanner testified that he was not present at that time, and it may reasonably be inferred from the fact that none of his employees requested to work overtime on January 12, 2010, that none of them were present either. UP has also pointed to evidence indicating that no one from UP expected the delivery to be made after sunset. It is undisputed that the man who helped Edling unload the truck did not provide any form of identification, and was not wearing a reflector vest or hard hat, and UP has pointed to evidence indicating its employees are supposed to wear a reflector vest and hard hat when working on or near a railroad track. Viewing these facts in the light most favorable to UP and making all reasonable inferences in UP's favor, a reasonable finder could conclude that the man who helped unload the grapple truck was not associated with UP, and that no one from UP was present to accept delivery of the grapple truck.[8]

In other words, when viewing the facts in the light most favorable to UP and making all reasonable inferences in UP's favor, the record reflects that Edling left the

---

[8] The Court notes the evidence to which the Defendants have pointed indicates UP had in place a policy allowing for deliveries to be effected by leaving a piece of equipment's keys on the equipment's dipstick, and that the policy applied *only when no one from UP was present to accept the delivery*.

grapple truck at the delivery site and, while an unknown individual watched, placed the keys on the truck's dipstick.  Under these circumstances, even if the delivery terms of the MCTA and bid documents did not apply and Edling was instructed to leave the keys on the truck's dipstick, a reasonable finder of fact could conclude something remained to be done to effectuate a valid and final delivery of the grapple truck to UP.  As a result, the Defendant's Motions will be denied to the extent they seek to establish UP failed to point to evidence sufficient to prove the second element of its prima facie case.

## B.  Damages Caused by the Loss

As noted, § 14706(a)(1) of the Carmack Amendment states that "liability imposed under this paragraph is for the actual loss or injury to the property."  49 U.S.C. § 14706(a)(1).  Nevertheless, the Supreme Court has interpreted the language of the Carmack Amendment to be "comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination."  *Se. Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29 (1936).  Therefore, several courts have found, and the parties seem to agree, that "special damages" are recoverable under the Carmack Amendment under certain circumstances.[9]

### 1.  Actual Loss or Injury to the Grapple Truck

"The proper measure of 'actual loss' under the Carmack Amendment is the difference between the market value of the property if it had been delivered according to

---

[9] *See, e.g.*, *Contempo*, 661 F.2d at 765; *Spray-Tek, Inc. v. Robbins Motor Transp., Inc.*, 426 F. Supp. 2d 875, 886 (W.D. Wis. 2006); *Tayloe v. Kachina Moving & Storage, Inc.*, 16 F. Supp. 2d 1123, 1129 (D. Ariz. 1998); *Main Rd. Bakery, Inc. v. Consol. Freightways, Inc.*, 799 F. Supp. 26, 28 (D.N.J. 1992); *Starmakers Pub. Corp. v. Acme Fast Freight, Inc.*, 646 F. Supp. 780, 782 (S.D.N.Y. 1986).  *Cf. Just Take Action, Inc. v. GST (Americas) Inc.*, No. 04-3024 ADM/RLE, 2005 WL 1080597, at *4 (D. Minn. May 6, 2005) ("The Carmack Amendment incorporates common law principles of damages[.]").

the contract, and the market value of the non-conforming goods." *See Camar Corp. v. Preston Trucking Co., Inc.*, 18 F. Supp. 2d 112, 115 (D. Mass. 1998), *aff'd,* 221 F.3d 271 (1st Cir. 2000); *Contempo Metal Furniture Co. of Cal. v. E. Tex. Motor Freight Lines, Inc.*, 661 F.2d 761, 764 (9th Cir. 1981) (citing *Gulf, Colo. & Santa Fe Ry. v. Tex. Packing Co.*, 244 U.S. 31, 37 (1917)).

UP has pointed to evidence indicating that the grapple truck was worth approximately $240,000.00 when the train collided with it.  The Defendants have pointed to evidence indicating that the damage to the grapple truck equals approximately $80,000.00.  Therefore, assuming UP can establish its prima facie case, and the Defendants fail to avoid liability by establishing one their available defenses, *see Cont'l Grain Co.*, 837 F.2d at 839, a material issue of fact remains with respect to the amount of the "actual loss or injury" caused to the grapple truck.

### 2.  Special/Consequential Damages

UP seeks to recover damages for the amounts it paid to settle the FELA claims arising out of, and the train delays caused by, the train colliding with the grapple truck.[10] The Defendants contend that these damages are not recoverable because they were not reasonably foreseeable at the time Beemac agreed to transport the truck for UP.

"Special damages are those that the carrier did not have reason to foresee as ordinary, natural consequences of a breach when the contract was made." *Contempo*,

---

[10] In its Complaint, UP also appears to seek recovery for the damage done to the train that collided with the grapple truck.  Landstar and Edling represent that "UP has indicated to Defendants that it is no longer seeking damages for the property damage to the locomotive.  However, the Complaint has not been amended to reflect such statement."  (Landstar and Edling Br., Filing No. 145 at 13 n.4.)  UP has not asserted in its motion or any of its briefs that it seeks to recover for damage to the train. Therefore, UP will be deemed to have abandoned the issue.  *See* NECivR 39.2(c).

661 F.2d at 765.  They are recoverable if the plaintiff can "show that the carrier had notice of the special circumstances from which such damages would flow."  *Id.*; *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (internal quotation marks omitted) ("The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made.").  In other words, special damages are recoverable only if they were "reasonably foreseeable to [the carrier] when it undertook to transport the goods."  *Id.*[11]  The foreseeability of special damages is a question of fact.  *See Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 550 (5th Cir. 2005).  "Where [a] contract is silent on the subject [of special damages], . . . common sense" is to be used to "determine what the parties intended by considering the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously."  *Schonfeld*, 218 F.3d 164, 172 (2d Cir. 2000).

UP contends that a carrier, agreeing to transport a heavy piece of equipment to a shipper's rail yard where trains are normally operated, would foresee at the time it agreed to transport the equipment the possibility that an improper delivery could lead to train delays and personal injuries to the shipper's employees.  The Defendants contend that UP has failed to point to any evidence indicating that they could have foreseen that

---

[11] *See also* 24 Williston on Contracts § 64:12 (4th ed.):

Consequential damages . . . include those damages that, although not an invariable result of every breach of this sort, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach. . . .

Stated another way, when a defendant has reason to know, before entering into the contract in question, of facts indicating that particular, though unusual damages, will follow or may follow the defendant's failure to perform its agreement, the defendant is liable for such damages.

train delays and injuries to employees might be caused by a breach of the agreement to ship the grapple truck. Beemac argues that the claimed special damages are outside the realm of foreseeability because the grapple truck had already been "delivered" when the train collided with it, and nothing indicates that the grapple truck was unloaded onto, or too close to, the railroad tracks such that one would expect a train to collide with it.

Viewing the facts in the light most favorable to UP and drawing all reasonable inferences in UP's favor, a reasonable finder of fact could conclude that, at the time the Defendants' agreed to transport UP's grapple truck, it was foreseeable that a negligent delivery of the truck to UP's rail yard could result in a train colliding with the grapple truck which, in turn, could cause personal injuries and train delays. The Defendants' motions will be denied to the extent they seek to establish that UP cannot recover costs associated with its FELA settlements and train delays as special damages.

### 3. Limitation of Liability

In their Motion for Summary Judgment (Filing No. 44), Landstar and Edling move for summary judgment only with respect to UP's claims.[12] Landstar contends that its liability is limited by the terms of the CBTA to "the lesser of $1.00 per pound or $50,000 per truckload." (Landstar and Edling Br., Filing No. 145 at CM/ECF p. 15.)

The Carmack Amendment permits a carrier to limit its liability:

---

[12] Landstar and Edling have filed cross-claims against Beemac (Filing No. 48), alleging Beemac is required, pursuant to the CBTA, to indemnify them for any judgment entered against them in favor of UP in excess of $50,000.00. Beemac has filed a Motion for Summary Judgment (Filing No. 153) seeking judgment as a matter of law with respect to those cross-claims. The Court limits its discussion in this Memorandum and Order to the damages UP seeks to recover from the Defendants, and whether any of the Defendants have limited their liability with respect to UP. The Court will address whether Edling and Landstar may seek indemnity from Beemac for any judgment entered against them and in favor of UP that is in excess of $50,000.00 when it addresses the motion Beemac has directed toward Edling and Landstar's cross-claims, which it will do in a separate memorandum and order.

> [A] carrier providing transportation or service . . . may . . . establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established . . . by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 14706(c)(1)(A).  To limit its Carmack Amendment liability, the carrier must:

> (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to [the shipper's] choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.

*MidAm. Energy Co. v. Start Enters., Inc.*, 534 F. Supp. 2d 930, 935 (S.D. Iowa 2008) (citations omitted); *see also Just Take Action*, 2005 WL 1080597, at *7; *Nelson v. Bekins Van Lines Co.*, 779 F. Supp. 122, 125 (D. Minn. 1991) (citations omitted).  The carrier bears the burden of proving that it limited its liability.  *MidAm. Energy*, 534 F. Supp. 2d at 935; *Just Take Action*, 2005 WL 1080597, at *7.

The parties do not dispute that UP was not a party to the CBTA, or any other agreement with Landstar and/or Edling that might limit their liability with respect to UP. Therefore, Landstar and Edling's Motion will be denied to the extent they contend they limited their liability with respect to UP.  *See MidAm. Energy*, 534 F. Supp. 2d at 935-36 (emphasis added) (internal citations omitted) ("[T]o limit liability under the Carmack Amendment, the [second and] fourth prong[s] require[ ] the carrier to prove that it issued a receipt or a bill of lading that reflects the *agreement between the two parties to limit liability*" and that "[t]he bill of lading . . . *must be issued* prior to shipment.").

### C. Attorney's Fees

The Defendants contend that UP is not entitled to recover attorney fees because there is no statutory basis for such an award, nor is there a uniform course of procedure that allows for the recovery of attorney fees.  UP has not contested the

21

Defendants' motions with respect to its claim for attorney fees.  The Defendants'
motions will be granted to the extent they seek the dismissal of UP's claim for attorney
fees.  *See* NECivR 39.2(c).  *See also* 49 U.S.C. § 14706 (containing no general attorney
fee provision)[13]; *Tetherow v. Wolfe*, 392 N.W.2d 374, 379 (Neb. 1986) (stating that,
under Nebraska law, attorney fees are recoverable in the very case being litigated "only
when provided for by statute or allowed in the uniform course of procedure.").

### D.  Notice to Carriers[14]

Carriers may "impose contractual time limitations for bringing suit, subject only to
the statutory minimum of '9 months for filing a claim' and '2 years for bringing a civil
action[.]'"  *5K Logistics, Inc. v. Daily Exp., Inc.*, 659 F.3d 331, 336 (4th Cir. 2011)
(quoting 49 U.S.C. § 14706(e)(1)).[15]  This allows the carrier to promptly investigate
claims "while still preserving an adequate time for shippers to seek recompense for

---

[13] The Court notes that the Carmack Amendment authorizes attorney fees under certain circumstances when "household goods" are at issue.  *See* 49 U.S.C. § 14708(d), (e).  "Household" goods do not appear to be at issue in this case.

[14] While the issue of whether UP provided the required notice of its Carmack Amendment claim has been presented as an affirmative defense, the Court notes that "lack of notice" might not actually be an "affirmative" defense.  *See Ford Motor Co. v. Transp. Indem. Co.*, 795 F.2d 538, 547 (6th Cir. 1986) (stating that "[t]he nine month filing provision of the Uniform Bill of Straight Lading at issue emanates from [the Carmack Amendment]," and that compliance with that provision is a "prerequisite[ ] to the bringing of an action under the bill of lading and [is] not subject to waiver or estoppel," making the 9-month filing requirement "an element of the cause of action" and not an affirmative defense).  *Cf. S & H Hardware & Supply Co. v. Yellow Transp., Inc.*, 432 F.3d 550, 555 (3d Cir. 2005) (stating that the plaintiff had "the burden of proof on the issue of whether it satisfied the [Carmack Amendment's] notice requirement.").  Nevertheless, as will be explained below, the Court finds, to the extent the issue has not been abandoned, that the uncontroverted evidence in the record reflects UP provided the required notice.

[15]

A carrier may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section. The period for bringing a civil action is computed from the date the carrier gives a person written notice that the claim has disallowed any part of the claim specified in the notice.

49 U.S.C. § 14706(e)(1).

damaged cargo." *5K Logistics*, 659 F.3d at 336.  To assert a claim "for loss, damage, injury, or delay to cargo," the shipper must file a claim "with the receiving or delivering carrier, or carrier issuing the bill of lading . . ., or carrier on whose line the alleged loss, damage, injury, or delay occurred, within the specified time limits applicable thereto[.]" 49 C.F.R. 370.3(a).  Notice of the claim must be provided in a manner consistent with 49 C.F.R. § 370.3(b), which states:

> Minimum filing requirements. A written or electronic communication (when agreed to by the carrier and shipper or receiver involved) from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and:
>
> (1) Containing facts sufficient to identify the baggage or shipment (or shipments) of property,
>
> (2) Asserting liability for alleged loss, damage, injury, or delay, and
>
> (3) Making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage; Provided, however, That where claims are electronically handled, procedures are established to ensure reasonable carrier access to supporting documents.

49 C.F.R. § 370.3(b); *see also* 49 C.F.R. § 1005.2(b).[16]  These requirements have been interpreted "liberally," and in light of their purpose, which is "to provide the carrier adequate notice of the claim so that it can conduct an independent investigation of the damage, not to relieve the carrier of liability."  *Siemens Power Transmission & Distribution, Inc. v. Norfolk S. Ry. Co.*, 420 F.3d 1243, 1245 (11th Cir. 2005); *see also S & H Hardware & Supply Co. v. Yellow Transp., Inc.*, 432 F.3d 550, 554 (3d Cir. 2005).

---

[16] *See Lewis v. Atlas Van Lines, Inc.*, 542 F.3d 403, 408 (3d Cir. 2008) (noting "[t]he regulations found in 49 C.F.R. § 370.3 went into effect in 1997 and are also found in 49 C.F.R. § 1005.2" and that "the two provisions are identical," and looking to cases interpreting either regulation to interpret § 370.3).

UP contends the letter it sent to Beemac[17] on September 24, 2010, contained information sufficient to satisfy the requirement of providing notice of its Carmack Amendment claim to the carriers.  None of the Defendants disputes that UP satisfied its obligations under § 370.3 when it sent the September 24, 2010, letter to Beemac.

The letter UP sent to Beemac identifies the shipment of the grapple truck; asserts liability for the alleged loss, injury, and delay; and indicates the amount of damages it alleges it sustained as a result of the shipment.  The Court finds, to the extent the Defendants have not abandoned the issue, *see* NECivR 39.2(c), that UP has satisfied its burden of providing adequate notice of its claim.  UP's motion will be granted to the extent UP seeks to establish that it provided adequate notice of its Carmack Amendment claim to the Defendants.

## II.  State Law Claims

The Defendants contend that UP's state law claims must be dismissed because they are preempted by the Carmack Amendment.  They argue that the Carmack Amendment preempts UP's state law claims because they are intricately tied to the manner in which the grapple truck was transported, stored, handled, and parked.  In other words, the Defendants assert that the Carmack Amendment preempts UP's state law claims because through them, UP seeks damages arising out of the same *conduct* that gave rise to its Carmack Amendment claim.  UP contends that the Carmack Amendment does not preempt its state law claims because those claims do not relate to

---

[17] *See Overton v. Chicago, R.I. & G. Ry. Co.*, 160 S.W. 111, 111 (Tex. Civ. App. 1913) ("It has been frequently held under the Carmack Amendment that in interstate shipments each connecting carrier is an agent for the others, and of course notice to one is notice to all."), cited in Pl.'s Br., Filing No. 151 at CM/ECF p. 22.  The Court notes that only Beemac has alleged that UP's Carmack Amendment claim is barred for lack of notice.

or arise out of the damage to the grapple truck; they relate to or arise out of *injuries* that are separate and apart from the damage to the grapple truck.

"In adopting the Carmack Amendment, Congress intended to impose a single uniform federal rule upon the obligations of carriers operating in interstate commerce." *Rocky Ford Moving Vans, Inc. v. United States*, 501 F.2d 1369, 1372 (8th Cir. 1974) (citing *New York, New Haven & Hartford R.R. Co. v. Nothnagle*, 346 U.S. 128 (1953); *Atchison, Topeka & Santa Fe Ry. v. Harold*, 241 U.S. 371 (1916); *Adams Express Co. v. Croninger*, 226 U.S. 491 (1913)).  The Carmack Amendment achieves this goal of uniformity by "embrac[ing] all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation [of property] to the agreed destination." *Se. Express*, 299 U.S. at 29 (internal quotation marks omitted)[18]; *see also Blish Milling Co.*, 241 U.S. at 196 ("[T]he words of the [Carmack Amendment] are comprehensive enough to embrace responsibility for all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation, which, as defined in the Federal act, includes delivery.").  Therefore, "when damages are sought against a common carrier for failure to properly perform, or for negligent performance of, an interstate contract of carriage, the Carmack Amendment governs," *Fulton v. Chicago, Rock Island & P. R. Co.*, 481 F.2d 326, 332 (8th Cir. 1973) (internal quotation marks omitted), preempting[19] any state-law causes of action arising from or based on

---

[18] "The underlying principle is that the carrier is entitled to base rates upon value and that its compensation should bear a reasonable relation to the risk and responsibility assumed." *Id.*

[19] The Court notes that while the Carmack Amendment contains a "savings clause," *see* 49 U.S.C.A. § 13103 ("Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law."), the "savings clause" preserves rights and remedies only to the extent they are "not inconsistent with the rules and regulations prescribed by the provisions of th[e] Act." *Adams*, 226 U.S. at 507.  As noted previously, the words of the Carmack

the common's carrier's performance[20] of the interstate contract of carriage.   S*ee Adams*

*Express*, 226 U.S. at 505-06[21]; *Smith*, 296 F.3d at 1246 (citing *Adams Express,* 226

U.S. at 505-06)[22]; *M.I.S. Eng'g, Div. of Research & Dev. Corp. v. U.S. Exp. Enters., Inc.*,

---

Amendment "are comprehensive enough to embrace responsibility for all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation[.]"   *Blish Milling Co.*, 241 U.S. at 196; *see also* 49 U.S.C. §13102(23) (defining "transportation" broadly); *see also Smith v. United Parcel Serv.*, 296 F.3d 1244, 1249 (11th Cir. 2002) (citing *Blish Milling Co.*, 241 U.S. at 196) ("The Supreme Court of the United States has described the preemptive effect of the Carmack Amendment very broadly."); *Underwriters at Lloyds of London v. N. Am. Van Lines*, 890 F.2d 1112, 1116 (10th Cir. 1989) ("[T]he Supreme Court and other authorities have described the Carmack Amendment in broad, preemptive terms, and have relegated the [saving's clause] to a category of almost total insignificance.").

[20] While there is authority that may support the proposition that the focus of a court's Carmack preemption analysis should be on the *injury* suffered, *see, e.g.*, *Rini v. United Van Lines*, 104 F.3d 502, 506 (1st Cir. 1997) (stating, in dicta, "liability arising from separate harms-apart from the loss or damage of goods-is not preempted. . . . Had [plaintiff] prevailed on her claim for intentional infliction of emotional distress, it would not have been preempted."); *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 289 (7th Cir. 1997) (relying on the dicta stated in *Rini* and concluding that the plaintiff's claim of intentional infliction of emotional distress was not preempted), the Eighth Circuit has indicated that the focus should be on the *conduct* giving rise to the plaintiff's claims.   *See Fulton*, 481 F.2d at 332.

[21]

That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from [the Carmack Amendment's] general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist.

To hold that the liability therein declared may be increased or diminished by local regulation or local views of public policy will either make the provision less than supreme, or indicate that Congress has not shown a purpose to take possession of the subject. The first would be unthinkable, and the latter would be to revert to the uncertainties and diversities of rulings which led to the amendment.

*Id.* (internal citations omitted).

[22]

To accomplish the goal of uniformity, the Carmack Amendment preempts state law claims arising from failures in the transportation and delivery of goods. . . .

While we agree that situations may exist in which the Carmack Amendment does not preempt all state and common law claims . . . , only claims based on conduct separate and distinct from the delivery, loss of, or damage to goods escape preemption. . . . In

26

438 F. Supp. 2d 1056, 1061 (D. Neb. 2006) ("A Carmack Amendment claim is therefore stated, and any state-law causes of action that might be asserted by M.I.S. based on these same facts are completely preempted.").

The Carmack Amendment preempts all UP's state law claims because through those claims, UP is seeking "damages . . . against . . . common carrier[s] for failure to properly perform, or for negligent performance of, an interstate contract of carriage[.]" *Fulton*, 481 F.2d at 332. With respect to its contract claims, UP seeks to recover damages from the Defendants resulting from their alleged breach of the indemnity and insurance provisions of the MCTA. (Filing No. 1 at ¶¶ 25-29, 35-38.) With respect to its negligence claim, UP seeks to recover damages from the Defendants for their negligent performance of the MCTA. (*Id.* at ¶ 22.) With respect to its common law indemnity claim, UP seeks to recover for damages based on the FELA liability it incurred due to the Defendants' alleged improper and/or negligent performance of the MCTA. (*Id.* at ¶¶ 30-34.) Because the Court finds that the Carmack Amendment preempts UP's state law claims, UP's Motion will be denied to the extent it seeks to establish its state law claims as a matter of law, and the Defendant's Motions will be granted to the extent that they seek the dismissal of UP's state law claims. The Court need not determine whether UP has pointed to evidence sufficient to establish its state law claims.

## CONCLUSION

UP has pointed to evidence sufficient to establish its Carmack Amendment claim. Material questions of fact remain, however, with respect to: whether a valid delivery of

---

other words, separate and distinct conduct rather than injury must exist for a claim to fall outside the preemptive scope of the Carmack Amendment.

*Id.* at 1248-49 (internal citations omitted).

the grapple truck was effected; and assuming a valid delivery was effected, the extent of the "actual loss or injury" caused to the grapple truck and whether UP may recover any amount of damages for train delays and its FELA liability resulting from the train colliding with the grapple truck.  The uncontroverted evidence in the record shows that UP provided the Defendants with sufficient notice of it Carmack Claim.  Although UP may have pointed to evidence sufficient to support its state law claims against the Defendants, they are preempted by the Carmack Amendment.

Accordingly,

IT IS ORDERED:

1.   The Motion for Summary Judgment (Filing No. 149) filed by Plaintiff Union Pacific Railroad Company, is granted in part, as follows:

> Plaintiff Union Pacific provided to the Defendants sufficient notice of its Carmack Amendment claim;

2.  Plaintiff Union Pacific Railroad Company's motion is otherwise denied;

3.   The Motions for Summary Judgment filed by Defendant Beemac Trucking, LLC (Filing No. 147), and Defendants Landstar Ranger, Inc., and Edward Samuel Edling (Filing No. 144), are granted in part, as follows:

> a)   The following state law claims, asserted by Plaintiff Union Pacific Railroad Company against the Defendants, are dismissed with prejudice:
>
> > i.    "NEGLIGENCE AS TO ALL DEFENDANTS", Filing No. 1 ¶¶ 20-24;
> >
> > ii.   "CONTRACTUAL INDEMNITY AS TO DEFENDANT BEEMAC", *id.* at ¶¶ 25-29;

      iii.   "COMMON LAW INDEMNITY AS TO ALL DEFENDANTS", *id.* at ¶¶ 30-34;

      iv.   "BREACH OF CONTRACT AS TO BEEMAC", *id.* at ¶¶ 35-38;

b)   Plaintiff Union Pacific Railroad Company's claim for attorney fees is dismissed with prejudice; and

4.    The Defendants' motions are otherwise denied.

Dated this 7th day of March, 2013.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge

29