## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, | CASE NO. 8:11CV8 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| BEEMAC TRUCKING, LLC,  LANDSTAR RANGER, INC., and EDWARD SAMUEL EDLING, | |
| Defendants. | |

This matter is before the Court on the Motion in Limine to Exclude Expert Testimony (Filing No. 156) filed by Defendants Landstar Ranger ("Landstar"), Inc., and Edward Samuel Edling; the Daubert Motion to Exclude Expert Opinions and Testimony (Filing No. 159) and the Motion in Limine (Filing No. 206) filed by Defendant Beemac Trucking, LLC ("Beemac"); and the Motion in Limine (Filing No. 203) filed by Plaintiff Union Pacific Railroad Company ("UP").  The motions found at Filing Nos. 156 and 159 are overlapping *Daubert* motions seeking to preclude the report and testimony of UP's designated expert, William F. Messerschmidt,[1] whom UP has designated as an expert to supply testimony concerning data obtained from an electronic control unit ("ECU") that was installed on the grapple truck (the "Truck") relevant to this case.  The motions found at Filing Nos. 203 and 206 are non-*Daubert* motions in limine seeking to preclude various categories of evidence.  The parties had an opportunity to address these four motions at a hearing held on April 22, 2013.  For the reasons discussed below, the

---

[1] The Court notes that Beemac's *Daubert* motion (Filing No. 159) also refers to the expert opinions, testimony, and reports of UP's experts Benjamin Smith and Alan Pearlman, who assisted in the Messerschmidt study and report.   UP's counsel has made clear that these experts worked with Messerschmidt in collecting the data used in the Messerschmidt study and report, and that they have been included on the Messerschmidt's report solely for foundational purposes.

Defendants' *Daubert* motions (Filing Nos. 156 & 159) will be granted; UP's Motion in Limine (Filing No. 203) will be granted in part; and Beemac's non-*Daubert* Motion in Limine (Filing No. 206) will be granted in part.

## GENERAL BACKGROUND[2]

In January 2010, Beemac, agreed to transport for UP the Truck from Benedict, Kansas, to Riverton, Louisiana. Beemac arranged to have Landstar transport the Truck for UP, and Edling, an owner/operator of Landstar at the time, was the driver who physically transported the Truck from Kansas to Louisiana. The Truck arrived at the delivery site the night of January 12, 2010, and at approximately 2:00 a.m. on January 13, 2010, a UP train collided with the Truck, which was parked on the railroad tracks.

On January 12, 2011, UP brought this lawsuit asserting five causes of action: (1) negligence against all the Defendants; (2) contractual indemnity against Beemac; (3) common law indemnity against all the Defendants; (4) breach of contract against Beemac; and (5) a claim under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 *et seq.*, against Beemac and Landstar. On March 7, 2013, the Court ruled on the parties cross-motions for summary judgment and dismissed UP's state law claims. (*See* Filing No. 196.) UP's only remaining claim is its Carmack Amendment claim.

"To make a prima facie case under the Carmack Amendment, a plaintiff must show 1) delivery to the carrier in good condition; 2) arrival in damaged condition[3]; and

---

[2] Events leading to this lawsuit are more fully summarized in the Court's Memoranda and Orders on prior motions. (*See* Filing Nos. 196 & 202.)

[3] "The liability of a carrier for damages to goods shipped through interstate commerce extinguishes upon delivery" of the goods to the proper party. *Intech, Inc. v. Consol. Freightways, Inc.*,

3) the amount of damages caused by the loss." *Camar Corp. v. Preston Trucking Co., Inc.*, 221 F.3d 271, 274 (1st Cir. 2000) (citing *Mo. Pac. R. Co. v. Elmore & Stahl,* 377 U.S. 134, 137-38 (1964)); *see also Cont'l Grain Co. v. Frank Seitzinger Storage, Inc.*, 837 F.2d 836, 839 (8th Cir. 1988).  If the shipper establishes its prima facie case, "to avoid liability the carrier must prove that it was not negligent and that the damage was caused by an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods." *Cont'l Grain Co.*, 837 F.2d at 839.  At this time, with respect to UP's prima facie case, only the second element is at issue.[4]  In other words, with respect to liability, still at issue in this case is whether the Truck was "delivered" before it was destroyed in the January 13, 2010, train collision, therefore not arriving in a damaged condition.

## DISCUSSION

### I. *Daubert* Motions (Filing Nos. 156 & 159)

UP has indicated that it intends to use the testimony of Messerschmidt to offer opinions about data retrieved from the ECU, a device that tracked the Truck's engine use.  Messerschmidt testified at the April, 22, 2013, hearing that the ECU tracked the Truck's engine use by generating two reports: (1) a daily engine usage report that

---

836 F.2d 672, 674 (1st Cir. 1987) (citing *Republic Carloading & Distributing Co. v. Mo. Pac. R. Co.*, 302 F.2d 381, 386 (8th Cir.1962)); *see also Republic Carloading*, 302 F.2d at 386 (emphasis added) ("Common carrier liability ceases upon delivery of the shipment *to the consignee.*"); *PolyGram Group Distribution, Inc. v. Transus, Inc.*, 990 F. Supp. 1454, 1458 (N.D. Ga. 1997) ("Liability under both [the Carmack Amendment and the Federal Bills of Lading Act, 49 U.S.C. § 80111(a),] ceases upon delivery of the goods to the proper person.").

[4] With respect to the third element, the parties do not dispute that the Truck was destroyed. Assuming that the Truck was "delivered" prior to the train collision, they dispute the value of the Truck at the time it was destroyed for purposes of calculating the "actual loss" caused to the Truck, and they dispute whether the Defendants have limited their Carmack Amendment liability and whether UP may recover special damages resulting from the allegedly negligent delivery of the Truck.

divided the twenty-four hour day into two-hour increments, indicating during each two-hour increment the total number of minutes the Truck was either driven, idle, or off; and (2) a "last stop" record, which kept track of more specific information for the last one minute and forty-five seconds before (a) the Truck was brought to a stop and the ignition turned off or (b) the Truck sat idle for fifteen minutes, and for the fifteen seconds thereafter.  UP has indicated that through Messerschmidt's testimony, it intends to show who controlled the Truck at the time it was placed on the railroad tracks, and attack Edling's credibility with respect to his claim that he did not control the Truck when it was placed on the railroad tracks because, prior to that time, he effected a valid and final delivery of the Truck by unloading it and hanging the keys on its dipstick. Messerschmidt concluded in his report that, based on the ECU data and Edling's driver's logs, Edling was either present when the Truck was moved, or left the delivery site when the Truck was idling.  (Filing Nos. 161-2 at 14, 161-3 at 5-6.)

The Defendants argue that Messerschmidt should be precluded from testifying as an expert in this case because the data obtained from the ECU, upon which he bases his opinions and conclusions, are inaccurate, unreliable, and in no way scientifically sound due to "clock drift" and certain drive time inaccuracies.  Specifically, they contend that Messerschmidt's opinions are based on data that is unreliable because an unknown amount of "clock drift" caused the ECU's internal clock to record events as occurring at inaccurate times when compared to the actual time the event occurred.  They also contend that Messerschmidt's opinions are based on inaccurate and imprecise data because the ECU would record slow driving and slow reverse driving as "idle" time and, although the ECU recorded the total amount of time the Truck

4

was driven, idle, or off in a two-hour increment, it did not reflect whether any of that "drive," "idle," or "off" time was continuous and in discrete segments, and it rounded continuous intervals of "drive," "idle," or "off" time to the closest minute.

### A. Standard

Federal Rule of Evidence Rule 702 allows for the admission of expert opinions. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In light of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999),[5] this Court must screen proffered expert testimony for relevance and reliability.  *See Bland v. Verizon Wireless, (VAW) L.L.C.,* 538 F.3d 893, 896 (8th Cir. 2008).  A reliable opinion must be based on scientific methodology rather than on subjective belief or unsupported speculation.  *See Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1208 (8th Cir. 2000).  In assessing reliability, the Court should consider factors including whether the proposed expert's theory, methodology or technique: 1) can be and has been tested; 2) has been subjected to

---

[5] The Supreme Court has held that *Daubert* applies to all expert testimony, not only scientific expert testimony.  *Kumho Tire Co.,* 526 U.S. at 141.

peer review; 3) has a known or potential rate of error; and 4) is generally accepted by the relevant community. *Bland*, 538 F.3d at 896. This list of factors is not exclusive, and this Court is allowed "great flexibility" in its analysis. *Jaurequi v. Carter Mfg. Co.,*173 F.3d 1076, 1082 (8th Cir. 1999).

The expert's information or opinion must also "assist" the trier of fact in understanding or determining a fact in issue. Fed. R. Evid. 702(a). "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591.

Furthermore, throughout the Court's assessment of the admissibility of an expert's opinion, *Daubert* makes clear that the Court "should also be mindful of other applicable rules," such as Fed. R. Evid. 403,[6] which states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

## B. Analysis

Having considered the parties' evidence, as well as their written and oral arguments, to the extent Messerschmidt's testimony might assist the trier of fact in determining a fact in issue, the Court is concerned that it will cause unfair prejudice to the Defendants, and that it may confuse the issues and mislead the jury, especially considering the seemingly unreliable and imprecise nature of the ECU's data.

---

[6] *Daubert*, 509 U.S. at 595; *see also United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996) (quoting *Daubert*, 509 U.S. at 595):

> *Daubert* makes it clear that when assessing the admissibility of proffered scientific expert testimony under Rule 702, the trial court must also take into account the interplay of other relevant rules of evidence, such as Rule 403: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

As explained above, the focus of UP's prima facie case is whether Edling effected a valid and final delivery of the Truck prior to the train collision. Who was in control of the Truck at the time it was placed on the tracks is, at most, marginally relevant to UP's prima facie case. The credibility of Edling's claim that he hung the Truck's keys on its dipstick becomes relevant only if Edling could have effected a valid and final delivery of the Truck by unloading the Truck and hanging the Truck's keys on its dipstick, especially if he did so when an unknown individual watched.[7] Furthermore, there appears to be no agreed upon, reliable point of reference in the structure of the ECU data; the ECU data have been affected by an unknown amount of "clock drift"; the "drive," "idle," and "off" time recorded in the data appears to be imprecise and potentially inaccurate, because the ECU rounded those times to the nearest minute and did not reflect whether any of the total time the Truck was supposedly in "drive," "idle," or "off" was continuous; and Messerschmidt would present these data to the jury with "'the aura of reliability and trustworthiness that surrounds'" expert evidence. *See United States v. Blade*, 811 F.2d 461, 464 (8th Cir. 1987) (quoting *United States v. Purham*, 725 F.2d 450, 454 (8th Cir. 1984)).

For the foregoing reasons, the Court finds that allowing Messerschmidt to testify as an expert could result in unfair prejudice to the Defendants, and could mislead and unnecessarily confuse the jury. Therefore, the Court will grant the Defendants' *Daubert* motions (Filing Nos. 156 &159), and UP will be precluded from offering Messerschmidt's reports and opinions.

---

[7] The Court notes that, when addressing the cross-motions for summary judgment, UP pointed to evidence indicating that it had entered into a contract with Beemac that contained delivery provisions which may have governed the delivery of the Truck, and nothing in the record indicates that the Truck was delivered in accordance with those delivery provisions.

## II.  Union Pacific's Motion in Limine (Filing No. 203)

In its Motion, UP seeks to exclude testimony, evidence, and argument relating to the following topics:

1.  That Union Pacific employees were present at the delivery site the evening of January 12, 2010, and/or January 13, 2010;

2.  The redacted file of Billy Barefield and the parties' discovery dispute with respect to the redacted versus unredacted file of Billy Barefield;

3.  Landstar's "Operating Rules and Charges for Terminal and Special Services and Exceptions to Rules Governing Classification" (the "Landstar Tariff") and "BCO [Business Capacity Owner] Resource Guide" and their relevance to the delivery of the Truck;

4.  The "Independent Contractor Agreement" (the "ICA") between Landstar and Edling and its relevance to the Defendants' liability to UP under the Carmack Amendment;

5.  That UP is bound to the bill of lading Landstar issued (the "Landstar Bill of Lading");

6.  The financial disparity between the parties or that a message should be sent to UP;

7.  UP's financial conditions, solvency, or ability to pay for the damage at issue in this case or that UP is the "largest railroad company in North America";

8.  Any documents or witness testimony not disclosed prior to trial or pursuant to a court order or deadline; and

9.  Expert opinions not disclosed in Defendants' answers to interrogatories or the records or depositions of the Defendants' experts.

### A.  Paragraph 1

UP contends that any discussion, testimony, questions, or colloquy suggesting the unknown individual at the delivery site was a UP employee should be prohibited because there is no evidence to support such an allegation, and even if there were, the

probative value of such evidence would be substantially outweighed by the danger of unfair prejudice to UP.

As explained previously, the remaining focus of UP's prima facie Carmack Amendment claim is whether Edling "delivered" the Truck prior to the train collision. Whether a UP employee was present to accept delivery of the Truck would be particularly relevant to that issue, and nothing indicates any of the evidence the Defendants may offer to show that a UP employee was present to accept delivery of the Truck would cause the jury to make a "decision on an improper basis," such as, "an emotional one." Fed. R. Evid. 403, 1972 Advisory Comm. Notes. Therefore, paragraph 1 of UP's Motion will be denied.

### B. Paragraph 2

UP contends that the redacted file of Billy Barefield[8] and evidence relating to the parties' discovery dispute about the redacted versus unredacted file of Barefield should be precluded because it is irrelevant and may cause the jury to conclude that UP tried to gain an unfair advantage over the Defendants by suppressing evidence. Landstar and Edling do not object to the preclusion of such evidence. Beemac contends that it does not intend to offer both of Barefield's files to highlight a discovery dispute between the parties, but asserts that it must be able to introduce both files to allow the jury to assess UP's overall credibility because Beemac did not have the unredacted file when it learned of Barefield's retirement and the immediate need to take his deposition in June 2012. UP responds that the redacted file is contained in its entirety within, and therefore consistent with, the unredacted file. Thus, UP argues that offering both files at

---

[8] Barefield is the former law enforcement officer from UP's railroad police department who conducted the investigation of who placed the Truck on the railroad tracks.

trial will serve no purpose other than to highlight the parties' discovery dispute, which is not relevant to any of the issues in this case.

Assuming all of the information in the redacted file is contained within the unredacted file, it is unclear how offering the redacted file at trial will tend to show anything other than that the parties engaged in a discovery dispute, and Beemac seems to acknowledge that the parties' discovery dispute is irrelevant to the issues that will be presented to the jury. The unredacted filed should serve Beemac's purpose of attacking UP's and Barefield's credibility because it contains all the information the redacted file contains. Therefore, paragraph 2 of UP's Motion will be granted.

### C. Paragraphs 3 & 5

In paragraph 3 of its Motion, UP contends that any argument or evidence suggesting the Landstar Tariff and Landstar's "BCO Resource Guide" are binding on UP should be precluded because UP has not been made a party to these documents. Similarly, in paragraph 5 of its Motion, UP contends all evidence suggesting that UP is bound by the Landstar Bill of Lading should be precluded because UP was not a party to the Landstar Bill of Lading and is, therefore, not bound by its terms.

The Defendants do not object to paragraph 3 of UP's Motion to the extent it relates to the BCO Resource Guide.[9] Therefore, evidence or argument suggesting that UP is bound by the terms of Landstar's BCO Resource Guide will be precluded.

The Defendants object, however, to paragraph 5 of UP's Motion because a jury could find that UP "waived" the right to claim that it is not subject to the terms of the Landstar Bill of Lading by refusing to sign it with full knowledge that Edling would be

---

[9] Beemac does not object to paragraph 3 of UP's Motion in its entirety.

transporting the Truck for UP.  Therefore, Landstar and Edling also object to paragraph 3 of UP's Motion to the to the extent it relates to the Landstar Tariff because it is relevant to the issue of damages--it purports to limit Landstar's liability for damage caused to the Truck--and the Landstar Bill of Lading incorporates the Landstar Tariff by reference.  UP replies that the fact UP did not sign the Landstar Bill of Lading is evidence that it did not intend to be bound by it, and asserts that it cannot be made a party to the Landstar Bill of Lading through the doctrine of waiver.

While "[a] party may waive a written contract in whole or in part, either directly or inferentially" through "express declarations manifesting the intent not to claim an advantage," *D & S Realty, Inc. v. Markel Ins. Co.*, 789 N.W.2d 1, 17-18 (Neb. 2010), the Defendants have failed to direct to Court to any authority indicating that the doctrine of "waiver" may make someone a party to a written agreement.  Nevertheless, the Carmack Amendment states that "[a] carrier providing transportation or service . . . *shall* issue a receipt or bill of lading for property it receives for transportation under this part," 49 U.S.C. § 14706(a)(1) (emphasis added), which may operate to limit a carrier's Carmack Amendment liability if the carrier:

> (1) maintain[s] a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain[s] the shipper's agreement as to [the shipper's] choice of liability; (3) give[s] the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue[s] a receipt or bill of lading prior to moving the shipment.

*MidAm. Energy Co. v. Start Enters., Inc.*, 534 F. Supp. 2d 930, 935 (S.D. Iowa 2008) (citations omitted); *see also Just Take Action, Inc. v. GST (Americas) Inc.*, No. 04-3024 ADM/RLE, 2005 WL 1080597, at *7 (D. Minn. May 6, 2005); *Nelson v. Bekins Van Lines Co.*, 779 F. Supp. 122, 125 (D. Minn. 1991) (citations omitted).  The "[f]ailure to issue a

receipt or bill of lading," however, "does not affect the liability of a carrier."  49 U.S.C. § 14706(a)(1).

Based on the current record, it appears unlikely that a jury would find UP agreed that the Defendants could limit their default Carmack Amendment liability by agreeing to the terms of the Landstar Bill of Lading and, therefore, the Landstar Tariff.  However, if the Defendants can show that despite not signing the Landstar Bill of Lading, UP was presented with a reasonable opportunity to choose between two or more levels of liability and agreed to be bound by the terms of the Landstar Bill of Lading, then a jury could find that UP was bound by the Landstar Bill of Lading and, therefore, the Landstar Tariff.   As a result, the Court will not preclude, in limine, argument or evidence suggesting that UP is bound by the Landstar Bill of Lading and Landstar Tariff. Paragraph 5 will be denied without prejudice, and Paragraph 3, to the extent it relates to the Landstar Tariff, will be denied without prejudice.

### D.  Paragraph 4

With respect to paragraph 4 of its Motion, UP argues that evidence or argument suggesting the ICA is relevant to UP's relationship with the Defendants should be precluded because it is irrelevant to their Carmack Amendment liability and because UP is not a party to the ICA.   Beemac does not object to paragraph 4 of UP's Motion. Landstar and Edling contend it is premature for the Court to consider paragraph 4 of UP's Motion because if the jury were to find that UP "waived" its claim that it is not bound by the Landstar Bill of Lading, the jury could also find that Edling was an intended third-party beneficiary of the Landstar Bill of Lading and can claim the benefit

of the limitation of damages provision contained in the Landstar Bill of Lading and Landstar Tariff.

The ICA is not relevant to whether the Defendants are liable to UP under the Carmack Amendment.  As previously noted, whether the Defendants are liable depends on whether the Truck was "delivered" prior to the train collision.  If the jury were to find that the Truck was not "delivered" prior to the train collision, the ICA may become relevant to show that the damages for which Edling may be responsible has been limited.  Therefore, the Court will not preclude, in limine, evidence or argument suggesting the ICA is relevant to UP's relationship with the Defendants.  Paragraph 4 of UP's Motion will be denied, without prejudice.

### E.  Paragraphs 6 & 7

In paragraph 6 of its Motion, UP seeks to preclude any reference or argument as to the parties' financial disparity, or arguments suggesting that a message should be sent to UP.  In paragraph 7 of UP's Motion, UP seeks to preclude any reference to UP being the largest railroad company in North America, or to UP's financial conditions, solvency, or ability to pay.  None of the Defendants objects to paragraphs 6 or 7 of UP's Motion.[10]  Therefore, paragraphs 6 and 7 of UP's Motion will be granted.

---

[10] The Court notes that although Beemac states that it objects to "paragraph 7" in its opposition brief, it appears Beemac was referring to paragraph 8 of UP's Motion.  (*See* Filing No. 210 at 7 § D., 8.) The Court also notes that although they do not object to paragraphs 6 or 7 of UP's Motion, Landstar and Edling represent that they do not intend to waive "their right to discuss the fact that UP is a sophisticated shipper which understands things such as shipping and freight processes, contracts, bills of lading, and tariffs[.]"  (Filing No. 212 at 8.)

**F.  Paragraphs 8 & 9**

In paragraph 8 of its Motion, UP seeks to preclude any testimony, argument, reference, or evidence concerning any documents or witness testimony not disclosed prior to trial or documents produced in this or other litigation that would otherwise be privileged.  In paragraph 9 of its Motion, UP seeks to preclude any expert testimony that the Defendants have not previously disclosed.  UP contends that the use of such testimony, argument, evidence, or documents would by prejudicial to UP and would constitute "unfair surprise."

Beemac objects to paragraph 8 to the extent it refers to deposition testimony or discovery responses not specifically designated and witness testimony to be used exclusively for impeachment purposes.  UP does not oppose Beemac's objection.

Landstar and Edling object to paragraphs 8 and 9 of UP's Motion, arguing that UP's request to preclude this testimony and/or evidence is premature because Fed. R. Civ. P. 37(c)[11] provides a party an opportunity to explain that its failure to disclose information or a witness was "substantially justified or . . . harmless" before the information is deemed inadmissible or the witness is prohibited from testifying.  Landstar and Edling also argue that they may present any documents or witnesses testimony necessary to rebut other testimony or evidence.

UP has not pointed to any specific, previously undisclosed evidence or testimony it seeks to preclude pursuant to paragraph 8 or 9 of its Motion, so the Court is unable to

---

[11]

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

determine if any failure to disclose was either "substantially justified" or "harmless."  The Court will deny paragraphs 8 and 9 of UP's Motion, without prejudice.

## II.  Beemac's Motion in Limine (Filing No. 206)

In its Motion, Beemac seeks an order excluding all testimony and evidence relating to the following:

1.   Settlement negotiations between the parties, pursuant to Fed. R. Evid. 408;

2.   The existence or lack of insurance coverage for Beemac, pursuant to Fed. R. Evid. 411;

3.   Offers or promises to pay medical, hospital, property damage, or similar expenses made by Beemac or on Beemac's behalf, pursuant to Fed. R. Evid. 409;

4.   Items not previously produced in the parties' discovery responses or in accordance with Order of the Court, except for evidence used exclusively for impeachment purposes;

5.   Damage to the locomotive that collided with the Truck;

6.   Damages not disclosed in UP's responses to Beemac's Interrogatory No. 2;

7.   The original cost of the Truck being the proper measure of damages under the Carmack Amendment;

8.   The data obtained from the Truck's ECU; and

9.   The suggestion or inference that the individual who placed the Truck on the railroad tracks was not an employee of UP.

### A.  Paragraphs 1 Through 6

There is no opposition to paragraphs 1 through 6 of Beemac's Motion in Limine. Paragraph 4 of Beemac's Motion, however, is substantially identical to paragraphs 8 and 9 of UP's Motion, and Landstar and Edling objected to paragraphs 8 and 9 of UP's

motion pursuant to Fed. R. Civ. P. 37(c)(1).  Therefore, paragraphs 1 through 3, 5, and 6 will be granted, and for the reasons discussed above with respect to paragraphs 8 and 9 of UP's Motion, paragraph 4 of Beemac's Motion will be denied, without prejudice.

### B. Paragraph 7

In paragraph 7 of its Motion in Limine, Beemac seeks to preclude any testimony, statement or evidence of the Truck's original cost because the Truck was used at the time of the accident and "[t]he proper measure of 'actual loss' under the Carmack Amendment is the difference between the market value of the property if it had been delivered according to the contract, and the market value of the non-conforming goods." *Camar Corp. v. Preston Trucking Co., Inc.*, 18 F. Supp. 2d 112, 115 (D. Mass. 1998), *aff'd,* 221 F.3d 271 (1st Cir. 2000); *Contempo Metal Furniture Co. of Cal. v. E. Tex. Motor Freight Lines, Inc.*, 661 F.2d 761, 764 (9th Cir. 1981) (citing *Gulf, Colo. & Santa Fe Ry. v. Tex. Packing Co.*, 244 U.S. 31, 37 (1917)).  Beemac also contends that, to the extent evidence of the Truck's original cost is relevant to determining "actual loss" under the Carmack Amendment, it would confuse or mislead the jury and cause unfair prejudice to the Defendants.  UP argues that testimony of the price actually paid for the Truck is probative of the Truck's market value at the time of the collision, and that it has identified a witness with sufficient knowledge to attest to the Truck's value.

While the original cost of the Truck may not be the best evidence of the Truck's market value at the time of the train collision because the Truck was not a recent purchase for UP (*see* Filing No. 152-14) and it was used at the time of the collision, it is relevant to that issue.  *Cf. Schonfeld v. Hilliard*, 218 F.3d 164, 178-79 (2d Cir. 2000) (citations omitted) (citing *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 741-42

(1997)) ("[I]t is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value.").  Paragraph 7 of Beemac's Motion will be denied.

### C.  Paragraphs 8 & 9

In paragraph 8 of its Motion in Limine, Beemac seeks to preclude any testimony, statement, or evidence concerning the data obtained from the ECU.  In paragraph 9 of its Motion, Beemac seeks to preclude any testimony, statement, or evidence suggesting that the individual who placed the Truck on the railroad tracks was not a UP employee.  Beemac seeks to exclude these two categories of testimony, statement, and evidence under a spoliation theory.

#### 1.  Spoliation Standard

A court may impose sanctions for spoliation of evidence if it finds that there was an "'intentional destruction indicating a desire to suppress the truth.'"  *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (citations omitted) (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004)).  The Court "'has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors.'"  *Id.* (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir.2004)).  Furthermore, "[t]here must be a finding of prejudice to the opposing party before imposing a sanction for destruction of evidence."  *Stevenson*, 354 F.3d at 748.

#### 2.  ECU Data

To the extent granting the Defendants' *Daubert* motions does not render paragraph 8 of Beemac's Motion in Limine moot, the Court finds that, although the delay

17

in downloading the ECU data may have caused further "clock drift", and therefore, degradation of that data, the record does not reflect that UP intentionally destroyed the ECU data with a desire to suppress the truth.  Messerschmidt testified at the hearing that, shortly after the train collision, UP engaged his services to retrieve the data from the ECU.  Although he was able to retrieve some of the data, he was unable to access the information that would have allowed him to determine more accurately the amount of "clock drift" that had occurred at that time because of the extensive damage to the truck.  (*See also* Dep. of William F. Messerschmidt, Filing No. 158-3 at 99:17-100:21, 107:16-108:3.)  The record also reflects that thereafter, UP and Messerschmidt took additional steps in an attempt to determine the amount of "clock drift" that had occurred.  Although UP could have acted more quickly, the Court is unable to conclude from the evidence currently in the record that UP intentionally allowed the ECU data to deteriorate with a desire to suppress the truth.  Therefore, paragraph 8 of Beemac's Motion in Limine will be denied.

### 3. Identity of the Unknown Individual

Beemac contends spoliation sanctions should be imposed on UP with respect to evidence of who placed the Truck on the railroad tracks because UP was solely responsible[12] for investigating the train collision and intentionally conducted an inadequate investigation.  To support its request for spoliation sanctions, Beemac points primarily to evidence indicating Barefield received an anonymous phone call from someone who offered, in exchange for job protection and a monetary reward, to identify

---

[12] The Court notes that the record reflects that Barefield worked with local authorities when investigating the train collision.  (Tr. of Videotaped Dep. of Billy Barefield, Filing No. 101-3, 57:24-58:3, 59:8-10, 69:7-16, 99:13-100:4.)

18

the person who placed the Truck on the train tracks.  Based on the evidence to which the parties have pointed in the record, while the Court agrees UP could have conducted a more thorough investigation, nothing indicates UP intentionally conducted an inadequate investigation for the purpose of concealing the fact that a UP employee placed the Truck on the railroad tracks or that Beemac has been prejudiced by the inadequate investigation.[13]   Therefore, paragraph 9 of Beemac's Motion in Limine will be denied.

Accordingly,

IT IS ORDERED:

1.    The Motion in Limine to Exclude Expert Testimony (Filing No. 156) filed by Defendants Landstar Ranger, Inc., and Edward Samuel Edling, and the Daubert Motion to Exclude Expert Opinions and Testimony (Filing No. 159) filed by Defendant Beemac Trucking, LLC, are granted;

2.    The Motion in Limine (Filing No. 203) filed by Plaintiff Union Pacific Railroad Company is granted in part, as follows:

a.    Paragraphs 2, 6, and 7 are granted;

b.    Paragraph 3 is granted to the extent it relates to the "BCO Resource Guide";

c.    The Motion is otherwise denied;

3.    The Motion in Limine (Filing No. 206) filed by Defendant Beemac Trucking, LLC, is granted in part, as follows:

a.    Paragraphs 1, 2, 3, 5, and 6 are granted; and

---

[13] The Court notes the record reflects that the investigation revealed that there was not enough evidence to charge Edling with placing the Truck on the railroad tracks.  (*Id.*, 69:7-16, 99:13-100:8.)

        b.      The Motion is otherwise denied.


    Dated this 30th day of April, 2013.

                                    BY THE COURT:

                                    s/Laurie Smith Camp
                                    Chief United States District Judge